## CONTINUATION IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent James Feasel, being first duly sworn, hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1.    I am a Special Agent with the Drug Enforcement Administration (DEA) currently assigned to the Grand Rapids District Office. I have been employed by the DEA since 2012. Within the meaning of 25 U.S.C. § 2803, I am a federal law enforcement officer who is empowered to conduct investigations, execute warrants, and make arrests. During my career in the DEA, I have participated in over 50 investigations and search warrants. I have completed Special Agent training at the DEA Academy in Quantico, Virginia. I have been trained in the use of physical, electronic and human intelligence surveillance techniques, counter surveillance techniques, use of firearms, report and affidavit writing, execution of arrest and search warrants, court testimony and financial investigation techniques.

2.    I make this affidavit in support of an application for a search warrant for information that is stored at premises controlled by Google, a provider of electronic communications service and remote computing service headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Attachment B.

3.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 United States Code, 2118 have been committed

by Keonta ANTHONY, William ANTHONY, Donald BEAUCHAMP, Dajohn DAVIS and other individuals. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

5. Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers. Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

6. I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity. These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network. A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi. Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network. In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

7. Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to

identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

8. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

9. Based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (*e.g.,* Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (*e.g.*, Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed in to their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (*e.g.*, example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed in to a Google account.

10. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

11.     Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

12.     According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

13.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

14.     Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location

History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

15. Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

16. Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience,

such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

17. Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.,* session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## PROBABLE CAUSE

*Georgetown Apothecary, Georgetown, KY*

18. On December 24, 2021, at approximately 6:42 AM, there was a break-in at the Georgetown Apothecary, 1002 South Broadway Street, Georgetown, KY. This is identified as Incident #1 and the area around the pharmacy and its parking lot is bounded by the following GPS coordinates:

|  |  |
|---|---|
| a. | 38.19111, -84.56086 |
| b  | 38.19103, -84.55975 |
| c. | 38.19047, -84.55988 |
| d. | 38.19058, -84.56094 |

19. The Georgetown Apothecary subsequently conducted an inventory of the pharmacy and determined that the burglar(s) had stolen approximately 4 different types of controlled substances from the pharmacy.

20. Investigators obtained surveillance video footage regarding the incident from the Georgetown Apothecary. Video surveillance showed that at approximately 6:42 AM, one perpetrator made forcible entry into the pharmacy through a side window and was observed holding a baseball bat and a garbage bag moments after entry. The pharmacy video surveillance footage showed a second perpetrator enter in tandem with the first perpetrator holding several large bags. Both perpetrators wore hooded sweatshirts, facial coverings, and gloves. Video surveillance footage inside the pharmacy showed both individuals removing pharmacy medications from shelves behind the counter and placing them into the bags. The burglary lasted approximately two minutes and the individuals quickly departed the area.

21. Investigators were informed by Detective Chris Faas of the Georgetown Police Department that upon arrival there was blood on pieces of shattered window glass and in other areas inside the pharmacy. Detective Faas informed investigators that approximately twelve pieces of evidence, some blood stained, were collected and sent to the FBI laboratory.

22. In late March 2021, investigators obtained a search warrant for a buccal sample of DNA from Keonta ANTHONY. The buccal sample was collected and sent to the FBI laboratory for further analysis. They determined that one of the samples tested revealed a positive CODIS match to William ANTHONY.

*Westside Pharmacy – Kalamazoo, MI*

23. Based on an ongoing investigation regarding the burglary of pharmacies, investigators obtained a search warrant from the District Court for the Eastern District of Michigan

to place a GPS tracker on a Jeep Compass known to be associated with DAJOHN CHRISTOPHER DAVIS.  The Compass was an Enterprise rental in DAJOHN DAVIS' sister's name.

24. On June 14, 2021, the tracker showed that at approximately 9:45 PM DAJOHN DAVIS went to DONALD BEAUCHAMP's home on Inkster Road, Redford, Michigan.  He stayed there for approximately three minutes, then went back to his own home, arriving around 10:10 PM.  The tracker left there again five minutes later and went to White Castle, then KEONTA ANTHONY's home on Riverview Street, Redford, Michigan, at approximately 11:05 PM.  At approximately 11:32 PM, he left KEONTA ANTHONY's home and drove west on I-96.

25. Investigators caught up to the Compass on I-94 during the early morning hours on June 15, 2021, and saw that it was driving westbound in tandem with a Jeep Cherokee registered to KEONTA ANTHONY (WILLIAM ANTHONY's brother).

26. The tracker indicated that the Compass arrived in the Kalamazoo area around 2:00 AM, and drove past the Woodbridge Pharmacy, stopping in a nearby neighborhood.   It left the area around 2:16 AM.

27. The tracker drove past the Gull Pointe Pharmacy around 3:00 AM and then parked in a housing complex immediately behind the pharmacy for several minutes.  The tracker drove past the pharmacy again several more times before leaving the area.

28. At approximately 3:43 AM, the tracker approached the Westside Pharmacy and turned around.  At approximately 4:05 AM, a member of the surveillance team observed both Jeeps pull into a Meijer gas station.  At that time, the surveillance team observed three black males meet in the parking lot, in close proximity to the Jeep Compass. A few minutes later, one of the black males entered the Jeep Compass and both left at approximately 4:11 AM.  After leaving the

gas station, the tracker went past the Westside Pharmacy four times, pausing in parking lots and a housing complex that have a direct line of sight to Westside Pharmacy.

29.  At approximately 5:20 AM, the Compass parked in the Westside Pharmacy parking lot.  Surveillance video (shown below) from the Westside Pharmacy showed three masked men with crowbars pry open the exterior door to the pharmacy building.  There were bars in the interior glass door to the pharmacy that the burglars were unable to break.  This is identified as Incident #2 and the area around the pharmacy is bounded by the following GPS coordinates:

   a. 42.29559, -85.67956
   b. 42.29562, -85.67753
   c. 42.29323, -85.67748
   d. 42.29315, -85.67984



30.  The burglars left the building around 5:25 AM and the tracker on the Compass left the parking lot around the same time.

31.  At approximately 5:57 AM, Michigan State Police caught up to the Compass and the Cherokee travelling north on US-131.  Troopers initiated a traffic stop of the Cherokee, and after a brief attempt to evade marked law enforcement units with activated lights and sirens, the

9

vehicle pulled over to the side of the road. KEONTA ANTHONY was the driver and sole occupant of the Cherokee. Investigators subsequently searched the car and found no crowbars, no garbage bags, and no burglary tools.

32. As the Cherokee stopped, the Compass sped away and marked units followed. At approximately 6:26 AM, the tracker showed that the Compass was going 116 miles per hour on I-96. The Compass exited the highway onto M-100 (at 115 miles per hour) and eventually ran into a residence on Greenwood Street in Grand Ledge at approximately 6:35 AM.

33. Two witnesses drove past the Compass shortly before it crashed. Police passed them, then they saw a black man wearing all black with white "shoes" running away from the location of the crash. They reported this to police, who followed their directions and found DAJOHN DAVIS within minutes. DAVIS was wearing all black with white socks and no shoes.

34. Police set up a perimeter around the area in Grand Ledge. Around 9:30 AM, witnesses reported that they saw two black men in a backyard near a dumpster. The two men then got into a white car that began to drive away but was stopped by police. DONALD BEAUCHAMP was in the backseat on the passenger side; WILLIAM ANTHONY was in the backseat on the driver's side.

35. DEA searched the Compass and found a yellow crowbar, a long green crowbar, a short green crowbar, several pairs of gloves, three face masks, a roll of garbage bags, and two sets of gym shoes that match those worn by two of the burglars. These items all appeared consistent with what the burglars wore and used in the Westside Pharmacy surveillance video. DONALD BEAUCHAMP's phone was on the front floorboard.

JURISDICTION

36.     On or about July 13, 2021, WILLIAM ANTHONY, KEONTA ANTHONY, DAJOHN DAVIS, and DONALD BEAUCHAMP were indicted in the Western District of Michigan for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, and conspiracy to commit burglary involving controlled substance, in violation of 18 U.S.C. § 2118(d).  18 U.S.C. § 2118(d) provides that it is a crime for two or more persons to conspire to violate section (a), which prohibits the burglary of controlled substances from registered pharmacies, and "one or more of such persons do any overt act to effect the object of the conspiracy."

37.     The indictment alleges that the burglary of the Georgetown Apothecary and the attempted burglary of the Westside Pharmacy were overt acts made in furtherance of their conspiracy to burglarize pharmacies.

38.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated" – the conspiracy to commit burglary of controlled substances. 18 U.S.C. § 2711(3)(A)(i).

CONCLUSION

39.     The location data requested in Attachments A and B will assist investigators by identify Google accounts that were present at the location and times of the burglaries.

40.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a

time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.